**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Genesis Healthcare, Inc. and its affiliated debtors, | ) | |
| | ) | |
| Plaintiffs. | ) | |
| | ) | Adversary Proceeding No. _____ |
| v. | ) | |
| | ) | |
| Integra Healthcare LLC, Altira Health Group, LLC, OPA OpCo Parent LLC, Joel Landau, Jonathan Kirschner, and David Gefner, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>COMPLAINT</u>**

Genesis Healthcare, Inc. ("<u>Genesis</u>") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (together with Genesis, the "<u>Debtors</u>" or the "<u>Plaintiffs</u>") hereby bring this complaint (the "<u>Complaint</u>"), pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), asserting causes of action against Integra Healthcare LLC ("<u>Integra</u>"), Altira Health Group, LLC ("<u>Altira Health</u>"), OPA OpCo

---

[1] The last four digits of Genesis Healthcare, Inc's federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

Parent LLC ("OPA" and together with Altira Health, "Altira"), Joel Landau, Jonathan Kirschner and David Gefner (together with Integra and Altira, the "Defendants"). In support of this Complaint, Plaintiffs respectfully state as follows:

**PRELIMINARY STATEMENT[2]**

1. This case involves another example of Joel Landau using his historical influence and control over the Debtors to engage in self-dealing and looting of the Debtors. The losses resulting from the acts of self-dealing at issue in this Complaint exceed $50 million.

2. After years of losing tens of millions of dollars on three master subleases covering 39 facilities with Integra (an entity owned and controlled by Joel Landau and David Gefner)[3], Genesis began exiting certain of the worst-performing facilities. By the end of 2024, Genesis was left with a portfolio of twenty-two Pennsylvania facilities (the "PA-22 Facilities"), and Genesis management believed the performance of the PA-22 Facilities was improving. Additionally, Genesis leased four other facilities under a separate sublease. By no later than January 2025, Genesis management was budgeting $5.2M in positive EBITDA from the PA-22 Facilities.

3. At the same time, Genesis was carefully considering a Chapter 11 filing, a fact well known to Mr. Landau. Because Mr. Landau and Integra had provided a guaranty on the performance of the leases to WTI, such a filing could trigger significant liability for Mr. Landau.

---

[2]  Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them in this Complaint.

[3]  In December 2022 and January 2023, Genesis—at Mr. Landau's insistence—agreed to enter into the Integra Subleases encompassing thirty-nine loss-generating SNFs in Pennsylvania, Colorado, and New Jersey, with Integra, an entity controlled by Mr. Landau. Integra had stepped in as master tenant to lease 147 facilities from a Welltower-Integra joint venture ("WTI"), and wanted to unload the worst-performing of those leases on another entity; Genesis agreed to be that entity. The Integra Subleases eventually cost Genesis over $100 million dollars in losses. The decision to enter those master subleases, and the fees paid for getting out of some of those subleases, will be the focus of a soon-to-come adversary complaint, and merely provide the backdrop to this proceeding.

He therefore wanted to remove Integra from its contractual relationship with Genesis entirely and thereby protect himself (and Integra) from being exposed on the guaranty.

4.      Thus, in the second half of 2024, Integra entered negotiations with a third-party, Altira, to transfer the master lease for the PA-22 Facilities to Altira.  As a condition to taking over the leasehold, Altira wanted the ability to terminate the lease on a short-term basis and take over the operation of the PA-22 Facilities from Genesis, if it later determined that it was in its best interest to do so. Altira therefore required that Integra negotiate a short-term termination right in the underlying sublease with Genesis.

5.      Despite the harm this could (and did) inflict on the value of the leasehold to Genesis, Mr. Landau instructed Mr. Kirschner, Genesis's CFO who had a longstanding relationship with Mr. Landau, to negotiate such a termination provision.  Mr. Kirschner, who was loyal to Mr. Landau instead of Genesis, complied. Prior to this series of transactions, *neither party* could terminate the sublease for the PA-22 Facilities once the security deposit due under the master sublease was fully funded absent an event of default. Thereafter, the sublease *could* be terminated by either party on 30-days' notice and *would* necessarily terminate upon Altira receiving regulatory approval to operate the PA-22 Facilities (among other closing conditions).

6.      These transactions damaged the value (and marketability) of the sublease for the PA-22 Facilities, with one bidder expressing disbelief regarding the termination right and modifying its bid downwards by approximately $40 million as a result. If the PA-22 Facilities performed as projected and became profitable, Altira held the unilateral right to terminate the sublease on 30 days' notice and assume operations for itself.  Genesis effectively gave away this valuable termination right—first to Integra, and then to Altira—in exchange for a termination right of its own that it knew was, at best, of limited value if not virtually worthless. By that time,

Genesis was planning to commence these Chapter 11 Cases, had retained restructuring advisors, and understood that it would be able to reject the leases in bankruptcy in any event.  Exercising the bargained-for termination right would therefore have been economically irrational in light of the properties' projected positive EBITDA and Genesis's anticipated ability to achieve the same result through lease rejection in Chapter 11.

7.      Additionally, Integra still retains, and has refused to repay, an $11.85 million lease deposit that should have been returned to Genesis.

8.      The cumulative loss to Genesis from these two improper insider transactions is more than $50 million.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Each count in this action is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

10.     Plaintiffs Genesis and its affiliated debtors are the Debtors in these chapter 11 cases. The Debtors currently operate more than 160 skilled nursing facilities ("SNFs") and assisted living facilities in multiple states.

11.     Defendant Integra Healthcare is a Delaware limited liability company.  Integra Healthcare's registered agent is American Incorporators Ltd., 1013 Centre Road, Suite 403-A, Wilmington, DE 19805.

12.     Defendant Altira Health is a Delaware limited liability company. Altira Health's registered agent is Platinum Filings, LLC, 555 E. Loockerman Street, Suite 320, Dover, DE 19901.

4

13.     Defendant OPA is a Delaware limited liability company. OPA's registered agent is Platinum Filings, LLC, 555 E. Loockerman Street, Suite 320, Dover, DE 19901.

14.     Defendants Joel Landau, Jonathan Kirschner and David Gefner are each natural persons.

## STATEMENT OF FACTS

### A.     Legal Background

15.     On July 9, 2025, the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court, thereby commencing these bankruptcy cases (the "Chapter 11 Cases"). The Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

16.     The causes of action asserted by the Plaintiffs against the Defendants herein are related to the PA-22 Transactions and the Deposit described in this Complaint.[4]

### B.     Factual Background

17.     Mr. Landau used his control over Genesis to place long-standing business partners and allies into key Genesis executive officer roles.  Many of Genesis's management team members were brought on by Mr. Landau as lieutenants to do his bidding.

18.     For example, Genesis's CEO and executive chairman since October 2021 co-founded Pinta Capital Partners with Mr. Landau and had various business relationships with Mr. Landau spanning approximately fifteen years.  Pinta Capital Partners began performing business support services for Genesis shortly after Mr. Landau took control of Genesis.  Additionally, Mr.

---

[4]     For the avoidance of doubt, the Debtors—including any successors and assigns—reserve all rights to pursue any and all additional claims and causes of action against the Defendants not asserted in this Complaint.

5

Kirschner worked for Aurora Health Network, a REIT controlled by Mr. Landau, before joining

Genesis as CFO in 2022. Genesis's chief performance officer formerly worked for Longevity

Health, a coordinated care health plan in which Mr. Landau is an investor, prior to joining

Genesis in May 2022.  In addition, at Mr. Landau's urging, in January 2022 Genesis entered into

a Consulting Agreement with Allure Care Management, LLC ("Allure") pursuant to which

Genesis engaged another Allure individual as Genesis' chief operating officer. Mr. Landau was

the founder and Chairman of Allure.

19.     In December 2022, Genesis agreed to sublease thirty-eight (38) SNFs in

Pennsylvania and Colorado from another entity owned and controlled by Joel Landau and David

Gefner, Integra. Gefner was the CEO of Integra and a long-term business associate of Mr.

Landau's.  On February 1, 2023, Genesis entered into a separate sublease agreement with Integra

with respect to one SNF in New Jersey. The Pennsylvania, Colorado, and New Jersey subleases

are collectively referred to as the "Integra Subleases" in this Complaint.  The December 2022

and February 2023 transactions, as well as the surrender fees paid when exiting certain of the

Integra Subleases, are not directly at issue in this Complaint and will be the focus of a soon-to-

be-filed action.

20.     When it entered the three master Integra Subleases, Genesis provided a substantial

deposit covering the 39 subleased facilities ("Deposit") equal to three (3) months' rent for the

relevant facility, which later grew to $11.85M.

21.     After suffering crippling losses, Genesis ultimately exited the Colorado master

sublease covering four facilities, the New Jersey master sublease covering one facility, and eight

6

of the Pennsylvania facilities under the Pennsylvania master sublease. By the end of 2024, Genesis's Integra Sublease portfolio included only twenty-six Pennsylvania facilities.

22.     In January 2025, Genesis amended the remaining Pennsylvania master sublease again. This time it removed four facilities (including the Pittsburgh Facility) from the Master Pennsylvania Sublease and scheduled those four facilities as the only facilities under the amended and restated version of the Master Pennsylvania sublease ("Master PA Sublease (1)"), effective as of December 22, 2022.  The 22 remaining facilities (i.e. the PA 22 Facilities) would stay under the Master PA Sublease, as amended ("Master PA Sublease (2)").

23.     The Deposit provision in Master PA Sublease (2) covering the PA-22 Facilities was deleted and an amendment was added, which provided that "the Security Deposit held under the terms of the [Master PA Sublease] shall be retained by Master Sublessor and held as the security deposit under Master [PA] Sublease (1)."  That meant that the Deposit, which was originally placed on more than 30 facilities, now covered only four facilities.  The Deposit was not reduced even though it was originally designed to cover potential exposure for more than 30 facilities and was originally set an amount equivalent to three months of rent on over 30 facilities.

24.     On the same day, Master PA Sublease (1) was amended again to remove three facilities from the PA Master Sublease (1).  This amendment left only one facility on the sublease.  The amendment left the same Deposit in place, even though it was originally placed on more than 30 facilities and was designed to protect against exposure by being equivalent to three month's rent on those 30 facilities.  It now covered just one facility and far exceeded three month's rent.

25. Mr. Kirschner negotiated these amendments on behalf of Genesis and did not seek board approval to leave the Deposit behind on only one facility. He also did not negotiate to reduce the Deposit or to receive a partial refund to reflect the reduced leasehold. He failed to seek board approval for any of these actions or decisions, even though these amendments were related party transactions and the Company's related party transaction protocol required board approval.

26. The Debtors' books and records were never revised to reflect these changes to the treatment of the Deposit and in fact the Debtors' books and records continue to reflect the Deposit as allocated among the PA 22 Facilities.

C. **PA-22 Transactions**

27. After exiting the worst of the Integra Sublease facilities, Genesis began to see some improved performance and a light at the end of the tunnel. At the end of 2024, its management believed the performance of the remaining facilities was improving. No later than January 2025, it budgeted positive earnings and a positive EBITDA of $5.2 million from the PA-22 Facilities, due to continued upswings in performance and increased rates charged.

28. Nevertheless, Mr. Landau was incentivized to transfer the subleases for the PA-22 Facilities away from Integra, which he owned with Mr. Gefner, for one critical reason. As Welltower's own Business Update[5] announced in November 2022, Mr. Landau and Integra agreed to guarantee performance of the subleased facilities to WTI (November 7, 2022 Business Update at 3) ("Integra and its partners will guarantee the lease subject to significant net worth requirements").

---

[5] *Welltower, Inc. Business Update* (Nov. 7, 2022) https://welltower.com/wp-content/uploads/2022/11/Business-Update-November-2022_vFINAL1.pdf.

29.     Mr. Landau knew that Genesis was carefully considering a bankruptcy filing by the end of 2024, which would potentially expose these guarantees on the rent obligations. He was, therefore, looking to transfer Integra's interest in the sublease to avoid triggering any sort of personal obligations, if and when the rental payments ceased.

30.     On January 1, 2025, Welltower and Integra terminated the master lease for the PA-22 Facilities, and Welltower simultaneously entered into a new master lease for the PA-22 Facilities with OPA. In addition, on information and belief, on January 2, 2025, Integra WIP Member LLC assigned its 15% ownership interest in the PA-22 Facilities to WELL PM Holdco 2 JV LLC.

31.     As it relates to Genesis, Mr. Landau enlisted Mr. Kirschner to assist in orchestrating the insertion of a 30-day termination right into the sublease for the PA-22 Facilities.  This was accomplished in a multi-part transaction (collectively, the "PA-22 Transactions"), which was consummated on January 1, 2025.

32.     Critically, as part of that transaction, the Debtors and Integra amended the original master sublease with respect to the PA-22 Facilities (the "Sublease Amendment") to, among other things, insert a mutual 30-day termination provision.  The original master sublease between the Debtors and Integra covering the PA-22 Facilities, dated December 22, 2022, had a term of twenty years and Integra (as sublessor) could terminate the sublease only upon an event of default or the Debtors' failure to fund the security deposit. On information and belief, Altira, who was planning to purchase Integra's interest, wanted to be able to terminate the sublease on a shorter basis and take over operation of the PA-22 Facilities if it ever determined it was in its best interest to do so. Accordingly, Altira asked Integra to negotiate a shorter termination right.

9

33. Under the Sublease Amendment (excerpted below), Genesis (as sublessee) and Integra (as sublessor) agreed to a 30-day termination right. Such termination, however, only would become effective upon the receipt of regulatory approvals for a New Operator (i.e. Altira) to operate the PA-22 Facilities.

> "Notwithstanding the foregoing, each of Master Subtenant and Master Sublessor may terminate this Sublease with thirty (30) days' advance written notice of its election to terminate; provided that, the effective date of such termination shall be the first of the month following the receipt of all regulatory approvals by New Operators (as such term is defined in that certain Operations Transfer Agreement attached hereto as Exhibit 17 (the "OTA")) or New Operators' assignee or designee."

34. On the same day, Altira substituted in for Integra as sublessor of the PA-22 Facilities.  Genesis consented to Integra's assignment of its rights to Altira (the "Altira Assignment"). Under the Altira Assignment, the Debtors also relinquished any purchase option that they had with respect to the PA-22 Facilities.

35. Also on the same day, the Debtors and Altira entered into an operations transfer agreement (the "OTA"), whereby Genesis was *required* to terminate the sublease and transfer operations of the PA-22 Facilities to Altira upon Altira's satisfaction of certain conditions therein within eighteen months of the effective date. The most significant condition under the OTA was Altira obtaining all required Government Authorizations (as defined in the OTA) to operate the PA-22 Facilities. The OTA is, therefore, part and parcel of the Sublease Amendment and the termination right contained therein.

36. Mr. Kirschner negotiated the PA-22 Transactions on behalf of Genesis.  He did not seek Genesis board of director approval for the Sublease Amendment – even though it was a related party transaction, and Genesis's related party protocol required board approval of all related party transactions.  The Genesis board of directors also did not approve the Altira

Assignment or the OTA, though the board was generally kept apprised of the Debtors'

performance under the Integra Sublease portfolio.

37.     These transactions negatively impacted the value of the subleases for the PA-22

Facilities. If the PA-22 Facilities generated profit, Altira would simply have the ability to

terminate the sublease on 30-days' notice and take over operations for itself.  The transactions

also damaged the market value of the subleases to Genesis, as potential buyers would not be

willing to pay the same amount for a leasehold interest that *could* be terminated in 30 days.

38.     The only consideration Genesis received in return for giving away this

termination right was a mutual termination right.  But Mr. Kirschner and Mr. Landau knew that

termination right was likely worthless to Genesis, given that Genesis had already retained

restructuring advisors and was beginning preliminary preparations for these Chapter 11 Cases.

Upon the filing of these Chapter 11 Cases, Genesis would, of course, have had the discretion to

reject the subleases for the PA-22 Facilities under section 365 of the Bankruptcy Code,

irrespective of the termination rights under the sublease agreement.

39.     Moreover, the existence of this termination provision depressed the value of the

Debtors' interests in the PA-22 Facilities during the Debtors' auction and sale process. The

Debtors estimate that but for the inclusion of this termination right, the Debtors' interest in the

PA-22 Facilities would have and could have been sold for at least $40 million more.

**D.      Failure to Repay the Deposit**.

40.     The Deposit on the Pennsylvania master sublease was originally equivalent to

three month's rent for the more-than 30 facilities covered under the master sublease.  During the

course of the parties' relationship, the Pennsylvania master sublease was amended in the manner

described above.

41.     The final amendment, entered on January 1, 2025, reduced the number of facilities to one, and the monthly rent to $1.5M, but preserved the Deposit at the same $11.85M, even though the master sublease now covered only one facility and the Deposit amounted to more than eight month's rent.  Mr. Kirschner did not seek to negotiate a reduction in the Deposit, nor a refund of the Deposit amount, to reflect the reduced leasehold and the reduced rent. Failing to seek a reduction and refund of the Deposit benefited Integra at the expense of Genesis.

42.     On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Order (I) Authorizing the Debtors to (A) Reject Certain Unexpired Real Property Leases and (B) Abandon Certain Personal Property, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 16] (the "Lease Rejection Motion"), seeking authority to reject certain unexpired real property leases (including any guaranties thereof and any amendments, modifications, or subleases thereto) for certain facilities that were closed or no longer operated by the Debtors and therefore not involved in the Debtors' sale process.  The A&R Master PA Sublease was listed on Exhibit 1 to the proposed order attached to the Lease Rejection Motion. No objections were filed to the proposed rejection of the A&R Master PA Sublease.

43.     On August 22, 2025, the Court entered the *Order (I) Authorizing the Debtors to (A) Reject Certain Unexpired Real Property Leases and (B) Abandon Certain Personal Property, Effective as of the Petition Date, and (II) Granting Related Relief* [Docket No. 562] (the "Rejection Order"), approving the Debtors' rejection of the A&R Master PA Sublease.

44.     The Rejection Order established a deadline by which counterparties were required to assert any claims arising from the rejection of the A&R Master Sublease.  Specifically, the Rejection Order provided that any rejection damages claim was required to be filed by the later

of the general claims bar date (which was later set by the Court as October 31, 2025) or thirty

(30) days after entry of the Rejection Order.[6]

46. Integra and its counsel were listed as a notice party in the A&R Master Sublease

received notice of the Lease Rejection Motion, the Rejection Order, and the applicable rejection

claims deadline.  Notwithstanding such notice, Integra did not file a proof of claim asserting

rejection damages or any other claim arising from the A&R Master Sublease before expiration of

the General Bar Date.

46. On June 3, 2026, counsel for the Debtors transmitted a letter to Integra and its

corporate and restructuring counsel demanding return of the Deposit no later than June 5, 2026.

Notwithstanding confirmation of receipt by Integra's counsel of the Demand Letter, Integra

failed to return the Deposit or otherwise identify any preserved claim entitling it to retain such

funds.

## CAUSES OF ACTION

47. Plaintiffs assert the following causes of action against the Defendants related to

the PA-22 Transactions and Deposit.

### COUNT I
**Avoidance of Actual Fraudulent Transfer under
Bankruptcy Code § 548(a)(1)(A) as to PA-22 Transactions
(Against Integra, Altira, Landau, and Gefner)**

48. Plaintiffs reassert and reallege the allegations contained in paragraphs 1-46 above,

as if fully set forth herein.

49. Bankruptcy Code § 548(a)(1)(A) provides that the court can avoid any transfer of

the Debtors' property or incurrence of an obligation made within two years of the petition that

---

[6] *See* Rejection Order, ¶ 6 ("[a]ny claims based on the rejection of the Leases set forth on Exhibit 1 shall be filed before the later of (a) the deadline for filing proofs of claim established in these Chapter 11 Cases and (b) thirty (30) days after the entry of the [Rejection Order], or else be forever barred.").

13

the debtor made with the actual intent to hinder, delay, or defraud any creditor. *See* 11 U.S.C. § 548(a)(1)(A).

50.     Bankruptcy Code § 550(a) provides that to the extent that a transfer is avoided under sections 544, 547, or 548 of the Bankruptcy Code, the trustee can recover the property transferred from either (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (2) any immediate or mediate transferee of such transferee. *See* 11 U.S.C. § 550(a).

51.     In connection with the PA-22 Transactions, the Debtors incurred obligations and effectuated transfers of property interests.

52.     Specifically, in connection with the PA-22 Transactions, the Debtors agreed to a termination provision that would allow Integra (and later, Altira) to terminate the sublease agreement for the PA-22 Facilities on thirty-days' notice without cause. Said differently, under the OTA, once Altira received regulatory approvals to operate the PA-22 Facilities, the sublease agreement necessarily terminated. In exchange for transferring that valuable termination right, the Debtors received a mutual termination right that was worthless. On information and belief, at the time of the PA-22 Transactions, the Debtors had already retained restructuring advisors and preparations for these Chapter 11 Cases had begun. Upon the filing of these Chapter 11 Cases, Genesis would, of course, have had the discretion to reject the subleases for the PA-22 Facilities under section 365 of the Bankruptcy Code, irrespective of the termination rights provided under the sublease agreement.

53.     Moreover, transferring the termination right to Integra (and later, Altira) has depressed the value of the subleases for the PA-22 Facilities. The Debtors estimate, based on information received during the recent sale process, that but for the inclusion of this termination

14

right, the Debtors' interest in the PA-22 Facilities would have and could have been sold for at least $40 million more.

54.  While the Debtors received no meaningful value through the PA-22 Transactions, each of the other parties involved benefited. Integra benefited by receiving a higher value from Altira in exchange for its interests in the PA-22 Facilities because of the inclusion of the termination right and attendant ability to take over operations of the PA-22 Facilities at Altira's discretion. Mr. Landau benefited as an owner of Integra and because transferring the PA-22 Facilities meant he was no longer personally on the hook as a guarantor for the SNFs' operations. Mr. Gefner benefited as the chief executive officer and equityholder of Integra. Altira, as the subsequent recipient of the termination right, likewise benefited. Altira also received the benefit of sharing in the upside of the PA-22 Facilities by receiving consulting fees equal to a percentage of the net revenue generated while it waited to receive regulatory approvals to operate the facilities outright.  Meanwhile, the Debtors were left with a newly profitable sublease portfolio that could now be terminated at any time by the sublessor.

55.  The transfers made as part of the PA-22 Transactions were with the intent to hinder, delay, or defraud the creditors of Genesis for the benefit of insiders, Mr. Landau and Mr. Gefner. As set forth above, Mr. Landau and the Debtors' management team orchestrated the PA-22 Transactions to relieve Mr. Landau of his personal guarantee for the SNFs' operations to the detriment of the Debtors and their creditors.

56.  The Debtors did not disclose the PA-22 Transactions to their creditors generally at the time of the transactions.

57.     The Debtors were either insolvent at the time of the PA-22 Transactions, rendered insolvent by these transactions, operating with unreasonably small capital, or believed that they were incurring debts beyond their ability to pay them.

58.     For the reasons set forth above, the transfers made and obligations incurred by the Debtors as part of the PA-22 Transactions were for the benefit of Mr. Landau, Mr. Gefner, Altira and Integra.

59.     Accordingly, Plaintiffs are entitled to a judgment against Integra, Altira, Mr. Landau, and Mr. Gefner (i) avoiding the transfer of termination rights to Integra and Altira in the PA-22 Transactions under Bankruptcy Code § 548(a), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

**COUNT II**
**Avoidance of Constructive Fraudulent Transfer under**
**Bankruptcy Code § 548(a)(1)(B) as to PA-22 Transactions**
**(Against Integra, Altira, Landau, and Gefner)**

60.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

61.     Bankruptcy Code § 548(a)(1)(B) provides that the court can avoid any transfer of the Debtors' property or incurrence of an obligation made within two years of the petition that the Debtor received less than reasonably equivalent value in exchange for and that was made when the debtor was insolvent, engaging in business with unreasonably small capital, and/or intended to incur debts beyond the debtors' ability to pay. *See* 11 U.S.C. § 548(a)(1)(B).

62.     Bankruptcy Code § 550(a) provides that to the extent that a transfer is avoided under sections 544, 547, or 548 of the Bankruptcy Code, the trustee can recover the property transferred from either (1) the initial transferee of such transfer or the entity for whose benefit

16

such transfer was made or (2) any immediate or mediate transferee of such transferee. *See* 11 U.S.C. § 550(a).

63.     In connection with the PA-22 Transactions, the Debtors incurred obligations and effectuated transfers of property interests.

64.     Specifically, in connection with the PA-22 Transactions, the Debtors agreed to a termination provision that would allow Integra (and later, Altira) to terminate the sublease agreement for the PA-22 Facilities on thirty-days' notice without cause. Said differently, under the OTA, once Altira received regulatory approvals to operate the PA-22 Facilities, the sublease agreement necessarily terminated. In exchange for transferring that valuable termination right, the Debtors received a mutual termination right that was worthless. On information and belief, at the time of the PA-22 Transactions, the Debtors had already retained restructuring advisors and preparations for these Chapter 11 Cases had begun. Upon the filing of these Chapter 11 Cases, Genesis would, of course, have had the discretion to reject the subleases for the PA-22 Facilities under section 365 of the Bankruptcy Code, irrespective of the termination rights provided under the sublease agreement.

65.     Moreover, transferring the termination right to Integra (and later, Altira) has depressed the value of the subleases for the PA-22 Facilities. The Debtors estimate that but for the inclusion of this termination right, the Debtors' interest in the PA-22 Facilities would have and could have been sold for at least $40 million more.

66.     While the Debtors received no meaningful value through the PA-22 Transactions, each of the other parties involved benefited. Integra benefited by receiving a higher value from Altira in exchange for its interests in the PA-22 Facilities because of the inclusion of the termination right and attendant ability to take over operations of the PA-22 Facilities at Altira's

discretion. Mr. Landau benefited as an owner of Integra and because transferring the PA-22 Facilities meant he was no longer personally on the hook as a guarantor for the SNFs' operations. Mr. Gefner benefited as the chief executive officer and equityholder of Integra. Altira, as the subsequent recipient of the termination right, likewise benefited. Altira also received the benefit of sharing in the upside of the PA-22 Facilities by receiving consulting fees equal to a percentage of the net revenue generated while it waited to receive regulatory approvals to operate the facilities outright.  Meanwhile, the Debtors were left with a newly profitable sublease portfolio that could now be terminated at any time by the sublessor.

67. The Debtors were either insolvent at the time of the PA-22 Transactions, rendered insolvent by these transactions, operating with unreasonably small capital, or believed that they were incurring debts beyond their ability to pay them.

68. For the reasons set forth above, the transfers made and obligations incurred by the Debtors as part of these transactions were for the benefit of Mr. Landau, Mr. Gefner, Altira and Integra.

69. Accordingly, Plaintiffs are entitled to a judgment (i) avoiding the transfer of termination rights to Integra and Altira in the PA-22 Transactions, under Bankruptcy Code § 548(a), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT III
**Avoidance of Constructive Fraudulent Transfer under
Bankruptcy Code § 544(b) and Pennsylvania Law As to PA-22 Transactions
(Against Integra, Altira, Landau, and Gefner)**

70. Plaintiffs reassert and reallege the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

71.     Bankruptcy Code § 544(b)(1) provides that the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable by a creditor under applicable state law. *See* 11 U.S.C. § 544(b)(1).

72.     Bankruptcy Code § 550(a) provides that to the extent that a transfer is avoided under sections 544, 547, or 548 of the Bankruptcy Code, the trustee can recover the property transferred from either (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (2) any immediate or mediate transferee of such transferee. *See* 11 U.S.C. § 550(a).

73.     The Debtors are headquartered in Pennsylvania.

74.     Under Pennsylvania law, a transfer made by a debtor or an obligation incurred by a debtor is avoidable as to a creditor if either (a) the debtor had actual intent to hinder, delay or defraud creditors or (b) the debtor did not receive reasonably equivalent value and was, at the time, insolvent, engaging in business with unreasonably small capital, and/or intended to incur debts beyond the debtor's ability to pay. *See* 12 Pa.C.S. § 5104.

75.     In connection with the PA-22 Transactions, the Debtors incurred obligations and effectuated transfers of property interests.

76.     Specifically, in connection with the PA-22 Transactions, the Debtors agreed to a termination provision that would allow Integra (and later, Altira) to terminate the sublease agreement for the PA-22 Facilities on thirty-days' notice without cause. Said differently, under the OTA, once Altira received regulatory approvals to operate the PA-22 Facilities, the sublease agreement necessarily terminated.  In exchange for transferring that valuable termination right, the Debtors received a mutual termination right that was worthless. On information and belief, at the time of the PA-22 Transactions, the Debtors had already retained restructuring advisors and

19

preparations for these Chapter 11 Cases had begun. Upon the filing of these Chapter 11 Cases, Genesis would, of course, have had the discretion to reject the subleases for the PA-22 Facilities under section 365 of the Bankruptcy Code, irrespective of the termination rights provided under the sublease agreement.

77.     Moreover, transferring the termination right to Integra (and later, Altira) has depressed the value of the subleases for the PA-22 Facilities. The Debtors estimate that but for the inclusion of this termination right, the Debtors' interest in the PA-22 Facilities would have and could have been sold for at least $40 million more.

78.     While the Debtors received no meaningful value through the PA-22 Transactions, each of the other parties involved benefited. Integra benefited by receiving a higher value from Altira in exchange for its interests in the PA-22 Facilities because of the inclusion of the termination right and attendant ability to take over operations of the PA-22 Facilities at Altira's discretion. Mr. Landau benefited as an owner of Integra and because transferring the PA-22 Facilities meant he was no longer personally on the hook as a guarantor for the SNFs' operations. Mr. Gefner benefited as the chief executive officer and equityholder of Integra. Altira, as the subsequent recipient of the termination right, likewise benefited. Altira also received the benefit of sharing in the upside of the PA-22 Facilities by receiving consulting fees equal to a percentage of the net revenue generated while it waited to receive regulatory approvals to operate the facilities outright.  Meanwhile, the Debtors were left with a newly profitable sublease portfolio that could now be terminated at any time by the sublessor.

79.     The Debtors were either insolvent at the time of the PA-22 Transactions, rendered insolvent by these transactions, operating with unreasonably small capital, or believed that they were incurring debts beyond their ability to pay them.

80.     For the reasons set forth above, the transfers made and obligations incurred by the Debtors as part of the PA-22 Transactions were for the benefit of Mr. Landau, Mr. Gefner, Altira and Integra.

81.     Accordingly, Plaintiffs are entitled to a judgment (i) avoiding the transfer of termination rights to Integra and Altira in the PA-22 Transactions under Bankruptcy Code § 544 and 12 Pa.C.S. § 5104, (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

### COUNT IV
**Avoidance of Preferential Transfer under Bankruptcy
Code § 547(b) as to PA-22 Transactions
(Against Integra, Altira, Landau, and Gefner)**

82.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

83.     Bankruptcy Code § 547(b) provides that the trustee may avoid any transfer of an interest of the debtor in property to a creditor, made on account of an antecedent debt, made while the debtor was insolvent, made to an insider within one year before the petition, that enables the creditor to receive more than such creditor would receive in a chapter 7 liquidation. *See* 11 U.S.C. § 547(b).

84.     Bankruptcy Code § 550(a) provides that to the extent that a transfer is avoided under sections 544, 547, or 548 of the Bankruptcy Code, the trustee can recover the property transferred from either (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made or (2) any immediate or mediate transferee of such transferee. *See* 11 U.S.C. § 550(a).

85.     In January 2025, Integra received the right to terminate the sublease for the PA-22 Facilities from the Debtors on account of antecedent debt and claims against the Debtors under the sublease.

86.     Less than one year after that transfer was made, the Debtors filed for relief under chapter 11 of the Bankruptcy Code.

87.     Integra is controlled by Mr. Landau, and Integra is an insider of the Debtors.

88.     The Debtors were either insolvent at the time of the PA-22 Transactions, rendered insolvent by those transactions, operating with unreasonably small capital, or believed that they were incurring debts beyond their ability to pay them.

89.     The transfer of termination rights allowed Integra to receive more than it would in a chapter 7 liquidation because, had the transfers not occurred, Integra would not have received as much value from Altira in exchange for assigning its rights under the Sublease Amendment.

90.     While the Debtors received no meaningful value through the PA-22 Transactions, each of the other parties involved benefited. Integra benefited by receiving a higher value from Altira in exchange for its interests in the PA-22 Facilities because of the inclusion of the termination right and attendant ability to take over operations of the PA-22 Facilities at Altira's discretion. Mr. Landau benefited as an owner of Integra and because transferring the PA-22 Facilities meant he was no longer personally on the hook as a guarantor for the SNFs' operations. Mr. Gefner benefited as the chief executive officer and equityholder of Integra. Altira, as the subsequent recipient of the termination right, likewise benefited. Altira also received the benefit of sharing in the upside of the PA-22 Facilities by receiving consulting fees equal to a percentage of the net revenue generated while it waited to receive regulatory approvals to operate the facilities outright.

91.     For the reasons set forth above, the transfers made as part of the PA-22 Transactions were for the benefit of Integra, Altira, Mr. Landau, and Mr. Gefner.

92.     For the foregoing reasons, the Debtors are entitled to a judgment against Integra, Altira, Mr. Landau, and Mr. Gefner (i) avoiding the preferential transfers made to Integra under Bankruptcy Code § 547(b), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT V
### Disallowance of Claims Under Bankruptcy Code § 502(d)
### (Against Integra, Altira, Landau, and Gefner)

93.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

94.     Bankruptcy Code § 502(d) provides that the court shall disallow any claim of any entity from which property is recoverable under, among other things, Bankruptcy Code § 550, or that is a transferee of a transfer avoidable under, among other things, Bankruptcy Code §§ 544 or 548, unless such entity or transferee has paid the amount, or turned over any such property. *See* 11 U.S.C. § 502(d).

95.     For the reasons explained above, Integra and Altira are initial and subsequent transferees, respectively, of transfers avoidable under Bankruptcy Code §§ 544, 547, and 548, which property is recoverable under Bankruptcy Code § 550(a).

96.     Mr. Landau, Altira and Mr. Gefner are the beneficiaries of the transfers avoidable under Bankruptcy Code §§ 544, 547, and 548, which property is recoverable under Bankruptcy Code § 550(a).

23

97. Integra, Altira, Mr. Landau, and Mr. Gefner have not returned the property transferred or turned over such property for which they are liable under Bankruptcy Code § 550(a).

98. Accordingly, Plaintiffs are entitled to a judgment, pursuant to Bankruptcy Code § 502(d), disallowing all claims of Integra, Altira, Mr. Landau, and Mr. Gefner against the Debtors.

**COUNT VI**
**Breach of Fiduciary Duty as to PA-22**
**Transactions and Deposit Transaction under Delaware Law**
**(Against Landau and Kirschner)**

99. Plaintiffs reassert and reallege the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

100. Under applicable Delaware law, directors and officers owe fiduciary duties of care and loyalty to the corporation and its stockholders, requiring them to act in good faith, with informed, disinterested, and independent decision-making for the long-term benefit of the company. These duties include oversight of corporate operations, acting prudently, avoiding conflicts of interest, and maximizing corporate value for stockholders.

101. On information and belief, since December 2022, Mr. Kirschner has served as a corporate officer of the Debtors.

102. Mr. Landau exercised significant control over Genesis's board and business affairs from 2021 to the petition date, including in connection with the PA-22 Transaction and Deposit transactions. For example, on information and belief, Mr. Landau directed Genesis, through Mr. Kirschner, to amend the sublease for the PA-22 Facilities to add a mutual termination provision, along with the OTA that would terminate the sublease for the PA-22 Facilities upon Altira's receipt of regulatory approval to operate the facilities. Mr. Landau also

instructed Genesis, through Mr. Kirschner, to leave the Deposit in place and not seek to reduce and refund it to Genesis. Mr. Kirschner in turn carried out these instructions by negotiating to include the termination right and failing to get approval for the termination right from the board, failing to negotiate a reduction and refund of the Deposit. Mr. Landau and Mr. Kirschner therefore owe fiduciary duties to the Debtors under Delaware law.

103. Genesis is a Delaware corporation.

104. In orchestrating and implementing the PA-22 Transactions and the Deposit transactions, Mr. Landau and Mr. Kirschner placed their own interests above the interests of the Debtors. In doing so, they each breached their unqualified obligation to act in the Debtors' best interests.

105. Mr. Landau and Mr. Kirschner's misconduct was not an exercise of good-faith business judgment and their actions were not entirely fair. Mr. Landau and Mr. Kirschner knowingly intended to benefit Mr. Landau, his business partners, and his affiliates at the expense of the Debtors. The Debtors, at Mr. Landau and Mr. Kirschner's direction, did not conduct adequate diligence on this transaction with an affiliated party.

106. The PA-22 Transactions and the Deposit transactions were not approved by a special committee of independent directors. Nor were they considered or approved by the Genesis board.

107. As a direct and proximate result of the misconduct, Genesis was unable to realize the value of the PA-22 Facilities—either through continuing to operate them or through selling the sublease interests at auction during these Chapter 11 Cases. It also did not receive a reduction and refund of the Deposit.

108.    For the foregoing reasons, the Debtors are entitled to recover damages related to Mr. Landau and Mr. Kirschner's breaches of fiduciary duty, in an amount to be determined at trial.

### Count VII
### (Aiding and Abetting Breaches of Fiduciary Duty against Landau)

109.    Plaintiffs reassert and reallege the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

110.    Mr. Landau aided and abetted Mr. Kirschner's breaches of his fiduciary duties to Genesis with respect to the PA-22 Transactions and the Deposit transactions.  Under Delaware law, Mr. Landau is liable for aiding and abetting a breach of a corporate fiduciary's duties if the third-party knowingly participates in the breach.

111.    For the foregoing reasons, Mr. Landau acted with actual knowledge that the conduct for which he advocated and encouraged Mr. Kirschner to pursue constituted a breach of fiduciary duties

112.    The Debtors are entitled to recover damages related to Mr. Landau's aiding and abetting Mr. Kirschner's breach of fiduciary duties.

### Count VIII
### (Declaratory Judgment against Integra)

113.    Plaintiff repeats, realleges, and incorporates the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

114.    Plaintiff seeks a declaration that Defendant failed to preserve any rejection damages claim arising from the A&R Master PA Sublease.

115.    Integra may not retain or apply the Deposit on account of any such rejection damages claim arising under the A&R Master PA Sublease and Bankruptcy Code section

362(a)(7) stays any setoff of a debt owing to the Plaintiff by the Defendant against a claim against the Plaintiff.

116.    The Deposit is property of the Plaintiff's estate pursuant to Bankruptcy Code section 541(a).

**Count IX**
**(Turnover – 11 U.S.C. Section 542)**

117.    The Plaintiff repeats, realleges, and incorporates the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

118.    Following expiration of the claims bar dates set forth in the Rejection Order and Defendants' failure to file a proof of claim, Defendants lack any remaining basis to retain or apply the Deposit.

119.    Unless the Court orders a turnover of the Deposit, the Defendants will be unjustly enriched and permitted to retain the Deposit, which could otherwise be utilized by the Plaintiff to fund, among other things, administrative expenses and unsecured creditor recoveries.

120.    Bankruptcy Code section 542(a) provides, in pertinent part, as follows: "An entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under Section 363 of this Title, or that the debtor may exempt under Section 522 of this Title, shall be delivered to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

121.    The Deposit is property of the Plaintiff's estate, as defined by Bankruptcy Code section 541, and therefore, Defendants are required to immediately turn over the Deposit to the Plaintiff.

## RESERVATION OF RIGHTS

122. Plaintiffs submit this Complaint without prejudice to, and with a full reservation of the Debtors' estates' rights, claims, defenses, and remedies, including the right to amend, modify, or supplement this Complaint, to raise additional claims relating to the matters addressed herein, and to introduce evidence at any hearing relating to the claims asserted herein.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, and as the evidence adduced at trial will demonstrate sufficient basis for, Plaintiffs respectfully request that the Court enter an order providing for the following relief:

i. Determining that Mr. Landau and Mr. Kirschner breached their fiduciary duties with respect to the PA-22 Transactions and Deposit transactions, and awarding damages in an amount to be determined at trial, in an amount of at least $50 million;

ii. Determining that Mr. Landau aided and abetted Mr. Kirschner's violations of his fiduciary duties with respect to the PA-22 Transactions and Deposit transactions, and awarding damages in an amount to be determined at trial, in an amount of at least $50 million.

iii. Avoiding the transfer of termination rights as part of the PA-22 Transactions as actual and constructive fraudulent transfers and recovering them for the benefit of the Debtors' estates;

iv. Avoiding the preferential transfers received by Integra as part of the PA-22 Transactions under Bankruptcy Code § 547;

28

v.  Disallowing the claims of Integra, Altira, Mr. Landau, and Mr. Gefner against the Debtors under Bankruptcy Code §502(d) due to their receipt of voidable transferred property of the estates;

vi.  Recovering as damages the Deposit and the reduction in sales value to the PA-22 properties caused by the insertion of the termination right;

vii.  Declaring that Integra may not retain, apply or setoff the Deposit and that the Deposit is property of the Plaintiff's estate pursuant to Bankruptcy Code section 541(a); and

viii.  Such other damages and further relief as the Court deems just and proper.

Dated: June 25, 2026

*/s/ Thomas R. Califano*
**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Chelsea McManus (24131499)
2323 Cedar Springs Road, Suite 2600
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile:  (214) 981-3400
Email:      tom.califano@sidley.com
             cmcmanus@sidley.com

- and -

William E. Curtin (admitted *pro hac vice*)
Anne G. Wallice (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile:  (212) 839-5599
Email:      wcurtin@sidley.com
             anne.wallice@sidley.com

*Counsel to the Special Restructuring Committee of Genesis Healthcare, Inc.*

**KATTEN MUCHIN ROSENMAN LLP**
Steven J. Reisman (admitted *pro hac vice*)
Cindi M. Giglio (admitted *pro hac vice*)
Marc B. Roitman (admitted *pro hac vice*)
50 Rockefeller Plaza
New York, NY 10020-1605
Telephone: (212) 940-8800
Email: sreisman@katten.com
cgiglio@katten.com
marc.roitman@katten.com

-and-

Dan Barnowski (admitted *pro hac vice*)
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3404
Telephone: (202) 625-3661
Email: dan.barnowski@katten.com

*Special Counsel to Genesis Healthcare, Inc. at the sole direction of Jonathan Foster and Elizabeth LaPuma in their capacity as Independent Directors and Members of the Special Investigation Committee*